Argued September 16, affirmed as modified December 16, 1964

McCORMACK et ux *v.* E. E. McCORMACK CO.,
INVESTMENT SERVICE CO.

397 P. 2d 198

*Robert H. Huntington,* Portland, argued the cause for appellant. With him on the briefs were Rockwood, Davies, Biggs, Strayer and Stoel, Portland.

*C. E. Wheelock,* Portland, argued the cause for plaintiffs-respondents. On the brief were Wheelock, Richardson, Niehaus & Baines, Portland.

Before PERRY, Presiding Judge, and SLOAN, O'CONNELL, DENECKE and LUSK, Justices.

PERRY, J.

The plaintiffs E. E. McCormack and Caroline Mc-Cormack brought this suit to foreclose a contract of sale wherein plaintiffs agreed to sell to the E. E. Mc-Cormack Co., a corporation, a plant manufacturing concrete products.

It is conceded on this appeal that the defendant E. E. McCormack Co. breached the sales agreement

with plaintiffs and that foreclosure was properly decreed.

The question raised on appeal is as to the priorities between liens claimed by the plaintiffs and liens claimed by the defendant Investment Service Co., as assignee of the United States National Bank of Oregon.

The contract of sale was entered into on March 1, 1961, and possession of the E. E. McCormack Co. and its assets was then taken over and held until the default sometime in February, 1963. In June, 1962, the E. E. McCormack Co. leased a portion of its premises to the Lawrence Warehouse Co. In July, 1962, the E. E. McCormack Co. began borrowing money from the United States National Bank and secured these loans through the pledge of manufactured products deposited with the Lawrence Warehouse Co., which warehouse company then issued its non-negotiable receipt to the bank.

The bank had notice of the provisions of the contract of sale at the time it advanced money to the E. E. McCormack Co. on the basis of the warehouse receipts. Also, the plaintiffs had notice that E. E. McCormack Co. was obtaining financing from the bank under the warehouse agreement.

The trial court held that the McCormacks held a lien under their contract of sale prior in right to that of the bank upon all of the unsold manufactured products of the E. E. McCormack Co. The Investment Service Co., as successor in interest of the bank, has appealed.

■ This case is a vivid illustration of the need of the Uniform Commercial Code in the commerce of this age. The Uniform Commercial Code was passed by the

1963 legislature, but, since the contract of sale and purchase was entered into before that act took effect, the case must be decided upon the law as it existed prior to its passage.

The contract of sale entered into between the sellers and purchasers clearly expresses the intention that the title to the real property, the machinery, furniture, fixtures and stock in trade (described as raw materials and finished products at the time of sale) should remain in the sellers until full payment of the purchase price had been made by the purchasers. The contract also provides:

"7. *POSSESSION and RIGHTS*. The Buyer is in possession of said lands, property, equipment and stock-in-trade and may retain such possession so long as it is not in default under the terms of this contract. The Buyer agrees that at all times it will:

"(a) Keep the buildings and improvements on said premises, now or hereafter erected, in good condition and repair and will not suffer or permit any waste or strip thereof; and

"(b) That it will keep said premises and property free from all liens and save the Seller harmless therefrom and reimburse Seller for all costs and attorneys fees incurred by Seller in defending against any such liens; and

"(c) That it will pay all taxes hereafter levied against said property, business, premises, equipment and stock-in-trade, as well as all public charges and municipal liens which hereafter lawfully may be imposed upon said property, equipment, business and stock-in-trade all promptly before the same, or any part thereof, become past due; and

"(d) That Buyer will, at Buyer's expense, insure and keep insured all buildings, machinery, fixtures and equipment, now or hereafter

erected or placed on said premises, against loss or damage by fire, with extended coverage in an amount of not less than $ *replacement* in a company or companies satisfactory to the Seller, with loss payable first to the Seller and then to the Buyer, as their respective interests may appear, with all policies of insurance to be delivered to the Seller as soon as insured.

"Should the Buyer fail to pay any such liens, taxes or charges or to procure and pay for insurance, the Seller may do so, and any payment so made shall be added to and become a part of the debt secured by this contract and shall bear interest at the rate of 10 per cent per annum without waiver, however, of any right arising to Seller for Buyer's breach of contract.

"*    *    *    *    *

"10. *MAINTENANCE OF INVENTORY AND EQUIPMENT.* The Buyer expressly agrees with the Seller as follows, to-wit:

"(a) That the Buyer will maintain a stock of merchandise, including materials and supplies at all times while there remains unpaid a balance on this contract equal in value at cost to $40,000; and

"(b) That the tools, machinery, equipment, furniture and fixtures shall be maintained and shall not be sold or otherwise disposed of while there remains unpaid any balance on the purchase price secured under this contract.

"It is understood and agreed, however, between the Seller and the Buyer that the Buyer shall have the right to sell the stock-in-trade in the regular course of business from time to time in the future, and that said property, when so sold, shall be released and discharged from any claim or lien thereagainst by the Seller. Further, that the Buyer may sell tools, machinery, equipment, furniture and fixtures provided that the property so sold be re-

placed with property of like or better quality and quantity, and that the lien of the Seller for the payment of the purchase price shall immediately attach to and become a first charge upon said property.

"\* \* \* \* \*

"12. *PROVISIONS ON DEFAULT OF SELLER.* It is understood and agreed between the parties that time is of the essence of this agreement, and in case the Buyer shall fail to make the payments above required, or any of them, punctually within ten days of the time limited therefor, or fail to keep any agreement herein contained, then the Seller at his option shall have the following rights:

"(a) To declare this contract null and void;

"(b) To declare the whole unpaid balance of the purchase price, with interest thereon, at once due and payable, and/or

"(c) Foreclose this contract by suit in equity, and in any of such cases, all rights and interests created or then existing in favor of the Buyer as against the Seller hereunder shall utterly cease and determine, and the right of possession of the premises and property above described and all other rights acquired by the Buyer hereunder shall revert to and revest in said Seller without any act of re-entry or any other act of said Seller to be performed and without any right of the Buyer of return, reclamation or compensation for moneys paid on account of the purchase of said property and business as absolutely fully and perfectly as if this contract and such payments had never been made; the Buyer agrees that in the event of a default Seller giving Buyer notice thereof in writing stating in effect that unless said default or other breach be cured on or before ten days subsequent to the date of notice, that the Circuit Court of the State of Oregon for the County of Washington shall, upon application of the

Seller, after the filing of a suit in equity to foreclose Buyer's rights hereunder and without further notice to the Buyer, immediately appoint a receiver who shall have the right to immediately take over the possession of the property sold hereunder, including stock-in-trade, receivables and other assets and to hold, manage and operate said property and business during the pendency of said suit. The parties further agree that the Seller may, in the discretion of the Court, be appointed as such receiver."

It is the contention of the defendant Investment Service Co. that the contract of sale as drafted was insufficient to grant the sellers a lien upon the property later acquired by E. E. McCormack Co. through the manufacture of merchantable concrete products. The defendant also contends, if such a lien is valid, it could attach to no more than the stock of merchandise, materials and supplies required to be maintained by the E. E. McCormack Co. under the contract.

■ While the following discussion speaks of chattel mortgages, it must be remembered that, while the instrument may be in form a conditional sale, such a security contract will be treated in equity as a chattel mortgage, unless contrary to the express intention of the parties. *Davis v. Wood et ux.*, 200 Or 602, 268 P2d 371.

The Investment Service Co. argues that the intention of a mortgagor to cover after-acquired property within the lien of a chattel mortgage must be clearly expressed, otherwise, in the absence of an express agreement, the property substituted for that mortgaged is not within the lien coverage. *In re John Hoos Co.*, 203 FS 641; 10 Am Jur 804, Chattel Mortgages § 137.

Other jurisdictions do not seem to follow this strict

rule, but state that, where the mortgage instrument clearly shows an intention by the mortgagor to subject after-acquired property to the coverage of the lien, this is sufficient, and that an agreement to keep a stock of merchandise in a certain amount or in present condition is sufficient to show such intention of the parties. *In re Simpson* (DC) 31 F2d 317, (CCA) 35 F2d 840; *Kettenbach v. Walker,* 32 Idaho 544, 186 P 912; *Cadwell v. Pray,* 41 Mich 307, 2 NW 52; *Wilson v. Lewis,* 63 Neb 617, 88 NW 690; *Madson v. Rutten,* 16 ND 281, 113 NW 872, 13 LRA NS 554; *Albien v. Smith et al,* 24 SD 203, 123 NW 675; *Ayers, Weatherwax & Reid Co. v. Sundback,* 5 SD 31, 58 NW 4, 929; *Armstrong v. Ford,* 10 Wash 64, 38 P 866.

We have found no cases, and the parties have cited none, wherein this particular issue has been considered or decided by this court. However, in *Flanagan Bank v. Graham,* 42 Or 403, 417, 71 P 137, 790, we stated:

"The general principle governing a mortgage intended to cover property not in existence or after-acquired seems be be that in law it is ineffectual and void, but in equity it is regarded as an executory agreement, which, if ineffectual *per se* to transfer the present legal title, operates to impress a lien according to the agreement of the parties, when the property is eventually brought into existence, and may be said to be acquired under the familiar maxim that 'Equity considers done that which ought to be done.' The instrument called a 'mortgage,' under such conditions, is construed as operating by way of a present contract to give a lien, which, as between the parties and all others having notice or knowledge thereof, takes effect or attaches to the subject as soon as it comes into the ownership of the mortgaging party: Jones, Ch. Mtgs. (4 ed.) § 170; Holroyd v. Marshall, 10 H. L. Cas. 191; Mitchell v. Winslow, 2 Story, 630 (Fed.

Cas. No. 9,673); France v. Thomas, 86 Mo. 80; Beall v. White, 94 U.S. 382; Kribbs v. Alford, 120 N.Y. 519 (24 N.E. 811); Ludlum v. Rothschild, 41 Minn. 218 (43 N.W. 137); Cameron & Co. v. Marvin, 26 Kan. 612; Dodge v. Smith, 5 Kan. App. 742 (46 Pac. 990)."

■ A chattel mortgage upon after-acquired goods is valid against a bona fide purchaser with actual notice upon the theory that such purchaser can have no better title than his vendor. 1 Jones, Chattel Mortgages and Conditional Sales (Bowers Edition) 262, § 156.

Since the bank, through whom the Investment Company claims, had knowledge of the contract and is placed in the shoes of the mortgagor, it would logically follow that the rule of intention to subject the after-acquired property to the lien of the mortgage should apply, and we so hold.

■ In our opinion, section 10 of the agreement, although not expressly providing that the after-acquired "stock-in-trade" should be subject to the contractual lien, is sufficient to express the intention of the parties that the after-acquired property should be subject to the lien securing the debt and bind a subsequent purchaser with knowledge.

There is, however, no expressed intention in the agreement nor any language used that indicates an intention of the parties to subject all the after-acquired "stock-in-trade," as defined in the agreement, to the lien of the mortgage. The lien is expressly limited to the inventory requirement "equal in value at cost to $40,000.00."

■ The defendant Investment Service Co. also contends that regular and continuous advances made upon the finished goods of the E. E. McCormack Co. should

be considered as sales made in the regular course of business.

We can find no merit in this contention. It is clear the transaction between the bank and the E. E. McCormack Co. was that of lender and borrower and not purchaser and vendor.

■ The Investment Service Co. also contends that, since E. E. McCormack and wife knew that the E. E. McCormack Co. was pledging the property manufactured and made no complaint to the bank, they should now be estopped to assert the priority of their lien.

Since the bank had knowledge of the rights of E. E. McCormack and wife in the after-acquired "stock-in-trade," it is not in a position to contend that it was misled.

The decree of the trial court is affirmed, except as above modified.

Neither party to recover costs.